2015-15-32 Good morning, Your Honors. This is not a typical patent case. I understand what you're arguing here with respect to imposing fees on counsel. As I understand it, you are not relying on Section 285 in that respect. Am I correct? With respect to imposing fees on joint and severability with opposing counsel, we are relying on the court's inherent authority that those fees can also be imposed on counsel. Try to answer my question. You are not relying on 285. Well, I think, Your Honor, we can rely on 285. That's not a question of whether you can. The question is whether you did. I didn't see in your brief that you did rely on 285. Am I wrong? I don't believe that it's clear from the brief that we're not relying on 285, but we are primarily— The burden's on you. If you're going to raise an issue, you have to raise it. You did not raise the issue of imposing counsel fees under 285 in your brief, right? If that's not in the brief, Your Honor, I accept that. Okay. It strikes me as an important issue, but not raised in this case. But go ahead. But we are certainly raising it under the inherent powers. You do say in your brief that the Eastern District of Texas almost never entertains summary judgment motions that early in a case, but you don't cite any authority for that proposition. Well, I mean, the authority is—I guess I've been practicing there a long time, but also the court had a scheduling order set that I believe is in the record that permitted summary judgment on indefiniteness during claim construction. But otherwise, it has a letter brief proceeding that's set up that permits you to file summary judgments— permits you to seek permission from the court to file summary judgment via letter brief, which is precisely what we did when we had the opportunity to do so per the court schedule. Where does that explain the almost never statement? I guess— I would expect a footnote with some history or something. Okay. Well, I guess the almost never statement stems from my personal experience in practicing out there that it's difficult to get them to entertain summary judgments early in the case. You didn't put an affidavit into that effect or anything? We did not, no, Your Honor. The Eastern District of Texas had this case for two and a half years, and then it was transferred to Washington. And so this is not the typical attorney's fees case in that the conduct that we contend here is the bad faith and sanctionable conduct mostly occurred before the district court judge who ultimately did not make the decision on fees. Despite this finding, Judge Lasnik did find this case to be exceptional, and he did find under inherent powers that there was bad faith, wanton, vexatious conduct. However, based on that finding, he awarded Nintendo only $33,000 in fees out of more than $7 million in fees sought, less than one-half of 1% of the requested amount. He awarded you 10% of the total fees relating to the infringement contentions. Well, he awarded 10% of the total fees that he deemed to be related to the plaintiff's failure to investigate and acquire 1,700 products. There doesn't seem to be much in the record to indicate that you spent a lot of time on those 1,700 products. There isn't much necessarily in the time records that precisely call out investigating 1,700 products. There is a lot in the record relating to the effort made to obtain discovery from the retailers, to work with the retailers on figuring out which products they sold, how those products were bundled, all of those things, which was made much, much more difficult because of the additional products. But Judge Lasnik made an error with respect to this aspect of the case in that he concluded that the infringement contentions were amended with respect to the products that were actually investigated only with respect to claim construction, and that's footnote four of his order. And that's simply not the case. This is a case where the infringement contentions were amended six times, only once. Only contentions number four were amended based on claim construction. All of the other amendments were based on either letters that we wrote forcing them to try again on infringement contentions or three times based on Judge Davis's orders. What's your point? My point is that that makes Judge Lasnik's ruling here with respect to excluding fees regarding the infringement contentions clearly erroneous. He abused his discretion because he did not understand that fact, that the infringement contentions here for the products they did investigate were not amended based on claim construction. They were amended based on the plaintiff's inability and failure to articulate PR 3.1 compliant contentions repeatedly. I'm not understanding your point. Well, that is conduct that Judge Davis certainly indicated in his last opinion on contentions that would be considered under 285. And our view is that because Judge Lasnik did not understand that fact that he erred on only awarding the $33,000 in fees as opposed to looking at all of the fees relating to getting the amended contentions, briefing the contentions issue, and forcing plaintiff ultimately to disclose what their actual theories were. This is a case where the last set of contentions wasn't filed until after expert reports issued. We didn't know their final theories, and Judge Davis found we didn't know their final theories until expert reports were filed. And in our view, that is certainly something that warrants more than $33,000 in fees. The other thing here that I want to get to is that the failure to investigate the products issue that Judge Lasnik did find to be exceptional and oppressive, that also directly relates to the venue issue here. Judge Davis issued his opinion transferring this case, and he talked about plaintiff's conduct after sitting on this case for two and a half years was contrary to the interest of justice. And plaintiff takes that statement and says, well, he's only talking about the 1404A transfer prong when he's saying that. And I submit that's, although it's in that part of its opinion, he is talking about more than that. Plaintiff, when this case was filed, as this court has found, the complaints, this was about Nintendo's products. We filed a proper severed transfer motion to try to stay the retailers, to simplify this case. The response to that was to blow this case up, to accuse 1,700-plus other products that were never investigated, and say, no, the retailers, they are proper parties. They shouldn't be stayed. The case shouldn't be transferred. And we then had the job of trying to put that genie back in the bottle. The district court has a lot of discretion under Octane and Highmark, right? The district court does, Your Honor. So how can we second-guess the district court on these things? Well, I think the district court's opinion here on that, on the venue issue, indicates that the court didn't analyze it. It's three sentences long. Venue was proper in Texas, and plaintiff's claims against various defendants were not meritless. That wasn't what we were ever contending. The bad faith conduct that we're contending here is plaintiff's failure to investigate these products that kept the retailers in this case and kept the district court from severing Nintendo and staying the retailers for two-plus years. During that time, we defended 10-plus retailer depositions, did discovery and answered discovery on behalf of 10-plus retailers. The fact that the retailers ultimately got dismissed out, that's great, but they shouldn't have been in the case for that whole two-and-a-half-year period to begin with. They should have been stayed, and that's where the bad faith conduct was, is that it delayed that resolution. And just to kind of beat this horse a little bit more, at the end of the case, I hope it's not a dead horse, Your Honor. If you believe so, I hope to convince you otherwise. But at the end of the case, there were eight retailers left in the case. Six of those retailers plaintiff didn't seek damages on other than joint and several liability damages. So we've litigated a case at that point through expert reports for eight total retailers that are left, and they don't even seek damages for six of them other than the joint and several damages for the sale of the Nintendo products that were accused to begin with. And that's just, in my view, Judge Lasnik's opinion here, and the fact that it's so sparse and he doesn't clearly reconcile Judge Davis's decision and Judge Davis's statements, the judge who lived with this case for two-and-a-half-plus years, that, to me, is an abuse of discretion and it should be remanded. And just to close here, we'll stand on our brief with respect to the direct pointing and image sensor claim construction issues. But the last point I want to make is the sanctions for attorney's fees awards, they're twofold. They're for compensating for money spent and for deterrence. And $33,000 in this case does not accomplish either of those goals, and therefore the case should be remanded back. I'll reserve the rest of my time. Thank you, Mr. Nelson. Mr. Rogers. Welcome back. Thank you. The first point is referring to the question of whether or not Nintendo had the ability to file an early summary judgment motion. What is in the record is that the scheduling order and the standing order from the district judge in the Eastern District didn't bar an early summary judgment motion. So that's what's in the record, and I'm not going to tell you what my personal experience is with the Eastern District, because that's not in the record. What is in the record is they had the ability and they were not barred from filing an early summary judgment motion. The court, the district court, the Washington District Court, granted this $34,000 in attorney's fees. And it is based on findings, which we can't tell whether they're 285 or the inherent powers. But regardless of which ones they are, no doubt the district court has discretion. And the standard is abuse of discretion. So I want to tell you why you should second-guess the district court and reverse that finding in granting of attorney's fees. It was based upon, if you look in the joint appendix or the addendum at A3, that's the portion, the second half of the page, the bottom half of the page, is the portion of Judge Lasnik's order that made these findings. And the findings of what they refer to, what the court refers to as bad faith, is based upon a non-testing of 1,700 products. So we have accusations against 1,900 games and we tested 200 of them. So the criticism is we should have tested more. Did you test 200 or you acquired 200? We acquired and tested 200. And there were 1,700 that at some point in the case were accused products that we neither acquired nor tested. And the reason why is of the 200 we tested, 100% of them had the we pointing feature that we were asserting infringement against. And so there was no need to test the remainder. It's not required under the law and it's not sanctionable conduct. And if you take a look at what the court found, you say, well, what was the result of not testing? And what you would expect to see is. . . Well, the court said as a factual matter that the remaining 1,700 were substantially different than the ones you acquired. Yes, and I'm going to. . . How can you argue. . . I'm going to tell you why you should second guess that. And the finding was. . . And so what this tells us is this finding that they were substantially different, that's an implication or almost explicit, that if we'd only acquired and tested those others, we would have found that they didn't have this feature. Well. . . No. It's a statement that they were substantially different. Yes, and. . . And might have. If they were substantially different than if we tested them, we would have found, or at least we might have found. . . Might have. They were substantially different. But we know that's not the case because the allegation or the finding of what is different is there's two things. One is that certain games had never been released to the market, and the other were that these were older game systems that were incompatible with the pointing features of the remote. So I'll address the first one. Products had never been released to the market. I think it's true that if we had made an attempt to test all 1,900, we probably would have discovered that we could not have acquired the products because they weren't released. But the reason why that isn't sanctionable conduct is we were relying upon. . . The reason why we named these products is because we tested 200 of the ones we acquired, 100 percent had this feature, and we believe that all Wii games therefore infringe. And so we looked and found a Nintendo published list of all Wii games, and that's what we used. And what that resulted in, this is not intentional naming of products that weren't released into the market. This was an honest mistake, and it was based upon reasonable reliance upon a published list. And so then you want to look to, well, what did we do when we were shown that these products hadn't been released? As soon as we found out, as soon as we were notified, Nintendo filed a motion complaining about it. And as soon as we were notified, we withdrew those games from our contentions. And so this was not some intentional naming of products that hadn't been released, and it's very relevant to look at what we did when we found out. And we immediately removed those. We didn't ask for any further evidence. We took them at their word, and we removed them. So this is not sanctionable conduct. This naming of, it was 60 products. That's not intentional conduct. That's not sanctional conduct. The next one, this finding. This is an erroneous fact finding where it says, others were used with older game systems that were incompatible with the pointing features of the Wii Remote. We did not accuse old game systems that were in their configuration prior to the Wii coming out. These were older games for the game systems before the Wii that were re-released as Wii games. And when they were re-released as Wii games, we confirmed, we have confirmed, and we put the evidence in the record, that these games all used the pointing feature. These claims that we were asserting were Beauregard claims. So it's computer software that it's instructing, it's software instructing a computer to perform functions. And that's exactly what these games do, the re-released games. They have the startup procedure that has the direct pointing feature that we accused of infringement. And the allegations that we hear from Nintendo is, well, that's just a startup procedure. It's part of the menu. It's not part of the game. Well, that's not the issue for infringement. And furthermore, the Wii menu, we've confirmed it and we have it in the record, the Wii menu, all that software is on the disks. And so whether it's the gameplay or the menu or the startup, it's all on the disks. All those game disks fall within the features that we asserted for infringement. So this finding, others were used with older game systems that were incompatible with the pointing features of Wii Remote. We have absolute evidence in the record that that is an erroneous fact finding. It should not be upheld, no matter what the level of discretion is that the court has. It is of use of discretion to sanction attorneys for this, based on this faulty fact finding. We have proven this to be wrong in the record. The attorneys haven't been sanctioned, correct? It's a sanction against the party, so you're correct. But it's certainly a blot on the attorney's record. But the relevant issue, the legal issue, is there should be no sanctions for this conduct that is based upon a faulty fact finding. And there is, it's more than just the finding of these facts. There's the follow-up that says, the court finds that the unnecessary and supported addition of over 1,700 accused products with no attempt to substantiate the accusations was in bad faith. Well, we did substantiate the accusations. We did it in the district court, and we've done it here, where we show our justification and reasonable reliance upon this published list. That's one of those 60 games that weren't released, ended up in the infringement contentions for a brief time. This inclusion of what they refer to as older game systems, these are re-release game systems, we maintain those, and even after they complain, we showed that those had the infringing features. The infringing features, use of the Wii remote for pointing that we accused of infringement. And those claims remained in the infringement contentions all the way up until we removed all the games after there was a claim construction on Claim 47. So these are, it is an abuse of discretion for this sanction to be awarded when it's based upon erroneous fact findings. And I'll reserve the rest of my time for rebuttal. We will do that, and that will be only on the cross-appeal. Correct. Mr. Nelson? So I want to address counsel's point with respect to their theories on the uninvestigated games. So in the record, at A7411 are the third amended infringement contentions. And the Claim 47, which is the claim that involved almost all of these products, is the contentions related to that claim began at A7463. Plaintiff had four separate theories of infringement for the games. The first one was this, quote, they call it a game startup. But it's actually not a game startup at all. It's the Wii menu, which resides on the Wii system as firmware. It's not a game. It never was. And that's, the best evidence here of what's going on is we have sort of a theory shift as this case progressed, plaintiff discovered this Wii menu aspect and actually accused the Wii menu as being Nintendo's infringement at the end of the case. And that's shown by the expert report that their experts Brogioli and Hooper put forth at A14967 and A14979 and 80. There, in opposing summary judgment, plaintiff cites to the exact same evidence as evidence of Nintendo's infringement that it's citing for now to support its theory that all these games that their failure to investigate really didn't have any effect. Does the record show that the 1,700 games that weren't investigated did not have the same features as the 200 games that were investigated? I think the record is silent with respect to that, Your Honor. That's their burden. The record is silent. I don't think it shows it one way or the other. But to your point further, their second infringement theory and what they went on for the games... So we don't know on this record whether their assumption that the 1,700 games had the same features as the 200 was right or wrong, right? That's correct, Your Honor. But in particular, with respect to their second theory, which is the in-game operation, these games did not. They sought the source code for all of these games, and their theory for game infringement, for example, Claim 47, which has a first point element. And at A5103, they're talking about hundreds or thousands of first points that these games could have. Suppose they'd come in and they'd shown that the 1,700 that weren't investigated did have the same features as the 200. Where would we be then? I don't think they can. They never investigated them. You have to accept my hypothetical. Can you repeat it, Your Honor? The hypothetical is suppose they showed that the 1,700 that weren't investigated did have the same features as the 200 that were investigated. Where would we be? Would it be appropriate under those circumstances to sanction them? Yes, it would, Your Honor, because the feature that they're talking about, the 200 that they investigate, isn't a game feature at all. It's the Wii menu, which resides on the Wii console as firmware. I don't think you're accepting my hypothetical. I'm saying that the 1,700 games turned out to have the same features as the 200 games that were investigated. No, I understand your hypothetical, Your Honor, but my point is, assuming you're correct, their whole theory with respect to that was that that was a game feature. And had they investigated this case properly, including the 200, they would have known that it wasn't a game feature. They conflate, first of all, this Wii menu feature... You're just not accepting my hypothetical. I'm saying that it's the same. They're the same. The 1,700 are the same as the 200. No, I understand your hypothetical, Your Honor, and my response to that is that their 200 that they did investigate under this, they quote, game startup theory, is actually about Nintendo. It's not about the games at all, these third-party manufactured games or the Nintendo games. And so even if your premise is correct and the same Wii menu is used for all 1,900-plus of them, that's not a game feature. They conflate game and disc. But that's to say that the 200 didn't infringe. That's correct, Your Honor, but... Well, but they weren't sanctioned for bringing the claims with respect to the 200. They were sanctioned for failing to investigate the 1,700. Correct. So let's assume that there was a culpable case with respect to the 200 and the 1,700 were the same as the 200. Would there be a basis for sanctions? I still think there would, Your Honor, because they're... One of four total theories. They had a second theory as well that we expended an extraordinary amount of money trying to figure out what it was with respect to all 1,900 games, and that's that the actual in-game operation infringed, and they sought source code for these games. They subpoenaed three third parties. That's an argument that the 200 that should be sanctioned for bringing the claims is to the 200 as well. No, that's an argument that they didn't investigate the other 1,700, thus we didn't have any idea what their theories were under... Even if your premise is correct with respect to the first theory, with respect to the second theory, we didn't have any idea what their theory was, and they had... They're saying there's thousands of these first points in every game. The games are different, you know, in-game play, that each of these games are different games, and so that failure to investigate still, in our view, is sanctionable conduct. Thank you, Mr. Nelson. I think we have your point. Thank you. Mr. Rogers has rebuttaled on the cross-appeal. I'd like for you to distinguish what's in the record versus what is attorney argument. When you hear counsel say that this startup procedure resides on the Wii system as firmware, look at every place in the brief where they say that. There's no record site. It's not in the record. It's attorney argument. What is in the record is that the Wii menu, that same thing they say is on the firmware, which I don't know whether it's on the firmware or not. It's not in the record. What I do know is, what the record evidence shows, is that the Wii menu is on all the Wii game disks. And once again, it's a question of the structure of this Claim 47. We were asserting infringement against the game disks. So all of their arguments about... Wait a minute. When you say the menu is on the disk, you mean it shows up when you insert the disk. No. The software is on the disk. And that's one of these green-colored record evidence sites that they designate as confidential. It's a fact. It's record evidence. And when we test 200 games, and 100% of them have this feature, it's more than just an assumption. It's reasonable inference that all the other games do too. And yes, the record is silent as to whether or not these 1,700 other games have the feature. But I think there's plenty of circumstantial evidence that there is. And it's telling the fact that the record is silent and that Nintendo, who controls all the manufacturing of these disks, hasn't brought in a single game that doesn't have that software on a disk. I can guarantee you, if there is any out there, we would have seen it in the record. And that was a reasonable assumption and inference when we made the allegation, and it remains today. We still believe that all of those 1,700 games have this infringing feature. What's involved in the testing? What is done to test the games? We insert the disk, we acquire the games, and we have a Wii system. We insert the games, and we did screenshots that we put into the record of the pointing feature, the startup menu, and even when you go into the operation of the game. And so that's why you see excerpts in the brief of these screenshots that's in the record, and we provided those as part of the infringement contentions. And so once again, when we test 200 games, it's reasonable conduct. We shouldn't be required to test all 1,700. And there's been no showing that if we had tested any more than 1,700, that things would have been any different. Except, of course, for the issue where there were 16 non-release games, and that's a different issue because we relied reasonably on a published list from Nintendo, and when it was pointed out to us that we were misreading the list, we immediately withdrew those claims. Well, I guess you could have come in and chosen some examples from the 1,700 and shown that they had the same features when it came to the attorney's fees issue, and you didn't do that. Well, I think this came very late in the game, and you're talking about a post-judgment proceeding on attorney's fees, and no, we were not doing discovery. We were not acquiring more games. I think it's still reasonable for us to rely upon the inferences that we made initially, and we still believe today. So we ask that you vacate and reverse the sections. Thank you. Mr. Rogers, we'll take the case on revisal.